# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

| | |
|---|---|
| **ANNA PIERCE,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | )   **No. 4:23-CV-00009 PLC** |
| | ) |
| **MARTIN O'MALLEY[1],** | ) |
| **Commissioner of Social Security,** | ) |
| | ) |
| **Defendant.** | ) |

## MEMORANDUM AND ORDER

Plaintiff Anna Pierce seeks review of the decision of Defendant Social Security Commissioner Martin O'Malley denying her applications for Disability Adult Child benefits (DAC) under Title II and Supplemental Security Income (SSI) under Title XVI of the Social Security Act. For the reasons set forth below, the Court affirms the Commissioner's decision.

## I.      Background and Procedural History

On September 20, 2016, Plaintiff who was born on October 8, 1998, filed an application for DAC, alleging she was disabled as of January 1, 2012 as a result of migraines, postural tachycardia syndrome (POTS), depression, anxiety, asthma, and "sleeps a lot[.]" (Tr.  49-50, 129-135) On May 30, 2017, Plaintiff filed an application for SSI, alleging she was disabled as of May 1, 2011, as a result of chronic light-headedness and migraines. (Tr. 140-153, 2214-2219) The Social Security Administration (SSA) denied Plaintiff's claims, and she filed timely requests for a hearing before an administrative law judge (ALJ).  (Tr. 14, 49-57)

---

[1] Martin O'Malley became the Commission of Social Security on December 20, 2023. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Martin O'Malley is substituted for Kilolo Kijakazi as the defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of 205(g) of the Social Security Act, 42 U.S.C. §405(g).

The SSA granted Plaintiff's request for review and conducted a hearing on June 21, 2018. (Tr. 14, 66) On November 7, 2018, the ALJ issued a decision finding Plaintiff not disabled. (Tr. 11-28) Plaintiff filed a request for review of the ALJ's decision with the SSA Appeals Council, which denied review. (Tr. 1-6)

Plaintiff appealed her case to the federal court, asserting the ALJ's RFC was not supported by some medical evidence and that the ALJ erred in evaluating Plaintiff's subjective statements and her treating physician's opinion.[2] (Tr. 2019-2035) The court found the ALJ did not provide good reasons for assigning little weight to the opinion of Plaintiff's treatment provider regarding her physical limitations and did not provide an explanation of how the evidence supported the ALJ's finding that Plaintiff could perform a full range of sedentary work. (Tr. 2033) The court reversed and remanded the action for further proceedings, and directed the ALJ to "properly consider the opinion evidence, obtain additional medical evidence regarding Plaintiff's physical limitations, and properly evaluate Plaintiff's subjective allegations." (Tr. 2034-35)

On remand, the matter was assigned to a different ALJ who conducted hearings in March 2022 and July 2022. (Tr. 1939-1971, 1972-2008) On October 14, 2022, the ALJ issued a decision finding Plaintiff not disabled. (Tr. 1910-1938) The Appeals Counsel did not assume jurisdiction in the matter. Thus, Plaintiff has exhausted all administrative remedies, and the ALJ's October 2022 decision stands as the Commissioner's final decision. See 20 C.F.R. §§ 404.984, 416.1484 (in cases remanded by a federal court, the decision of the ALJ becomes the final decision of the Commissioner unless the Appeals Council assumes jurisdiction).

## II.    Evidence Before the ALJ

### A.    Plaintiff's Testimony

---

[2] In her appeal, Plaintiff only challenged the ALJ's findings with regard to her severe impairment of myasthenia gravis. (Tr. 2027)

Plaintiff testified at each hearing conducted by the ALJs, including hearings on June 21, 2018, March 28, 2022, and July 26, 2022.

1. <u>June 21, 2018 Hearing</u>

Plaintiff was born in October 1998 and had completed one semester at St. Louis University (SLU) studying neuroscience. (Tr. 33) Plaintiff testified she took 15 credit hours her first semester and had classes scheduled 5 days per week but missed "a lot of class due to her illness." (Tr. 39-40) Plaintiff took a leave of absence from school the second semester. (Tr. 33) During her leave of absence, Plaintiff took an online course through the local community college. (Tr. 42) Plaintiff wanted to return to SLU in the future, hoping to take 12 credit hours and attend classes 3 days per week. (Tr. 42)

Plaintiff started IVIG[3] therapy for her myasthenia gravis (MG) in November 2017, and had received 7 treatments as of June 2018. (Tr. 34) The therapy helped Plaintiff's fatigue and energy level for "a very short period of time" but did not completely resolve her symptoms. (Tr. 35) Plaintiff continued to experience light-headedness and fatigue. (Tr. 35)  Plaintiff's physician recommended adjusting Plaintiff's treatment by continuing Mestinon and only using IVIG therapy as "a last resort" when her "symptoms are extremely poor." (Tr. 36)

Since leaving school, Plaintiff was "constantly exhausted" and "very light-headed." (Tr. 39) Plaintiff takes frequent breaks if she is active "in any manner." (Tr. 39) Plaintiff testified that "even half an hour of [activity,]" such as going to the grocery store, "can result in a 12-hour recuperation[.]" (Tr. 39) Plaintiff slept between 12 to 18 hours each day, averaging 14 hours per day. (Tr. 43) Plaintiff experienced light-headedness, which she described as feeling "like when you stand up too quickly and you get that feeling and…dizziness." (Tr. 43) Twice a week, the

---

[3] IVIG stands for Intravenous Immunoglobulin. See National Library of Medicine published by the National Institute of Health, https://www.ncbi.nlm.nih.gov/books/NBK554446/.

dizziness required Plaintiff to "hang onto the wall in order to stay steady[.]" (Tr.  43) Plaintiff laid

down to rest or "sometimes" took a nap when she was feeling "very poorly." (Tr.  43)

    2.  <u>March 28, 2022 Hearing</u>

In March 2022, Plaintiff lived with her mother who received disability benefits. (Tr.  1988-

89) Plaintiff spent approximately 10 minutes per day doing chores, including cleaning the floors,

changing the cat litter, taking out the trash, and letting the dogs outside in the morning. (Tr.  1989)

Plaintiff did the grocery shopping and usually cooked dinner, typically making a frozen or canned

meal. (Tr.  1989) Plaintiff's mother washed the laundry and the dishes, cleaned the bathrooms,

made the beds, dusted, and cared for her pets. (Tr.  1989-1991) Plaintiff had a driver's license. (Tr.

1990)

Plaintiff was diagnosed with MG and systemic lupus at the same time. (Tr.  1992)  Tariq

Alam, M.D. treats Plaintiff for MG while Joshy Pathparampil, M.D., treats Plaintiff's lupus. (Tr.

1992, 1996) Dr. Pathparampil advised Plaintiff that "the fatigue is possibly related to the lupus"

but Plaintiff stopped her treatments because they caused vomiting. (Tr.  1992) Plaintiff's "worst"

symptoms from MG are fatigue and light-headedness. (Tr.  1996)

Plaintiff testified she is disabled due to "major fatigue."  (Tr.  1991)  Plaintiff "always has

fatigue" and never feels fully rested. (Tr.  1991)  When Plaintiff exerts herself "to any extent" she

suffers from "increased light-headedness" and "extreme fatigue" and must "sleep over 12 hours

the next day in order to recuperate…to some extent[.]" (Tr.  1991)  Plaintiff has to sit in a reclining

chair for at least an hour after completing her chores. (Tr.  1996) Plaintiff never feels "normal"

and typically sleeps from 1 a.m. until 1 or 2 p.m. (Tr.  1996)

Plaintiff's light-headedness prevented her from going to school regularly because she did

not have the "capability" to walk in order to change classes; it "deterred her ability to concentrate

in class[;]" and it required resting, including "a lot of bed rest[.]" (Tr.  1997) While Plaintiff's ability to "walk around" has improved, the severity of her MG and lupus fluctuates, meaning she has "good days and bad days." (Tr.  1997) Plaintiff has "bad days," where she is exhausted and light-headed, 3 or 4 days a week. (Tr.  1997-1998) She is "bed-bound" one day a month. (Tr.  1998) Plaintiff's "flare-ups" last weeks or months. (Tr.  1998)

Plaintiff is able to walk one city block before needing a break. (Tr.  1998-99) Plaintiff sleeps 12-14 hours after spending an hour shopping at Walmart but wakes up "exhausted." (Tr.  1998-9)  Three or four times a week, she will get "immense light-headedness" forcing her to sit down for at least 10 minutes. (Tr.  1999) The light-headedness is "manageable" but "never fully goes away." (Tr.  1999-2000) Plaintiff also has anxiety that is "mostly related to school" where she make[s] up little scenarios in [her] mind" which then worry her. (Tr.  2003) While her medications help her anxiety, her symptoms persist to a lesser extent. (Tr.  2003)

Sitting tires Plaintiff and performing a job where she "sat all day and used [her] arms" would cause fatigue because she "still [has] the light-headedness" while sitting. (Tr.  2000) Plaintiff testified that even without doing chores, "just being around the house all day, getting up and moving around" causes her "problems." (Tr.  2001) Plaintiff was not able to continue taking guitar lessons 30 minutes a week. (Tr.  2002) Plaintiff has never had a job but "would like to attempt to do [a] part-time" job after getting her degree although it would require additional sick days, standing, a chair, and "more breaks." (Tr.  2002)

3.  <u>July 26, 2022 Hearing</u>

As of the July 26, 2022 hearing, Plaintiff continued to live with her mother and perform some household chores. (Tr.  1959) Plaintiff takes Wellbutrin and BuSpar for anxiety which "work[] well" and have "resolved a lot" of her anxiety. (Tr.  1958-59) With respect to whether she

had any other "mental health impairments[,]" Plaintiff testified she is "a little unhappy" "because of [her] illness[.]" (Tr.  1959)

Plaintiff testified that she went to college for "three and half years" and that it took her "four years to complete the seven semesters because [she] was doing so poorly, [and] had to take a leave of absence spring of 2018." (Tr.  1966) Plaintiff stated she started school in August 2017 and stopped in May of 2021.[4] (Tr.  1966)

Plaintiff believes her "extreme fatigue" prevents her from working a full-time job. (Tr. 1961) Plaintiff sleeps a minimum of 10 hours a day but could sleep 12 to 14 hours if given the opportunity. (Tr.  1961) Plaintiff explained that if she went to visit a relative that lives 45 minutes away, she "would be very fatigued and likely sleep 12 to 14 hours." (Tr.  1962) Plaintiff gets uncomfortable when sitting for a "long time" and has to "stand up and walk for a minute or two" before sitting back down. (Tr.  1963)  On the days her light-headedness is "especially exacerbated" she becomes "especially fatigued" and is unable to leave her bed. (Tr.  1964)  Plaintiff "sometimes [has] issues finding words" when she speaks. (Tr.  1961) Plaintiff testified that she would "love to work" and believes she may "be able to maintain a part-time schedule" but doing so "would take up all of my energy" and she would no longer be able to do any household chores or shopping. (Tr.  1964)

B.  Function Report

In a function report filed with SSA dated September 23, 2016, Plaintiff reported she suffered from chronic light-headedness, fatigue, and migraines. (Tr.  184) Plaintiff was "constantly

---

[4] Notably, in the year prior to her testimony, Plaintiff reported different information regarding her education to two of her medical providers. On March 19, 2021, Plaintiff reported that "she will graduate soon and she will be attending graduate school for health administration." (Tr.  2343) On December 6, 2021, seven months before Plaintiff's testimony at the final hearing, Plaintiff reported to another provider that she was "a full-time college student, pursuing her master's degree at SLU." (Tr.  2286)

exhausted" despite sleeping nine hours a night during the week and "up to 15" hours a night on the weekends. (Tr.  184) It was "nearly impossible" for Plaintiff to maintain concentration because she is light-headed and her "head always feel[s] fuzzy, foggy."  (Tr.  184) Plaintiff stated she "sometimes" forgets what she is about to say, stares into space, feels faint, loses her balance, trembles, and "get[s] white dots in her eyes[.]" (Tr.  184) Plaintiff occasionally has to request others to repeat themselves because she has difficulty "interpret[ing] what others are saying." (Tr. 191) Standing, walking and running intensify Plaintiff's symptoms. (Tr.  191)

In a typical day, Plaintiff wakes up, eats, gets ready for school, goes to school, returns home to eat and shower, and then goes to sleep. (Tr.  185)  Plaintiff sleeps most of the day on weekends. (Tr.  185)  Plaintiff has no problem attending to her personal care and does not need reminders to do so. (Tr.  185-186)  Plaintiff prepares herself one meal a month. (Tr.  186)  Plaintiff did not perform any chores during the school year because she is "exerting all of [her] energy into going to school." (Tr.  187) When she is not in school, Plaintiff is able to spend 5 to 10 minutes cleaning the bathroom and a mirror but needs help and encouragement to do so.  (Tr.  186)

Plaintiff is able to drive up to 35 miles at a time. (Tr.  187) She spends one hour, four times a year, shopping for clothing online. (Tr.  187) Plaintiff is able to pay bills, handle a savings account, count change, and use a checkbook. (Tr.  187) Plaintiff's interests include watching television for 30 minutes a day, listening to music for 10 minutes a day, and playing guitar for one and half hours a week. (Tr.  188) Plaintiff spends time with family at home and 20 minutes per week at her school's meeting for the National Honor Society. (Tr.  188)

Plaintiff's conditions affect her ability to perform any physical activity[5] because she is "constantly light-headed, even when sitting" and any exercise "intensifies [these] feeling." (Tr.

_____

[5] Plaintiff reported her condition affects her ability to lift, squat, bend, stand, reach, walk, sit, kneel, talk, climb stairs, see, and use her hands. (Tr.  189)

189) Plaintiff's conditions also impact her memory, completion of tasks, concentration, understanding, and ability to follow instructions. (Tr. 189) Plaintiff explained that she forgets words when talking, has trouble understanding, her short-term memory has "worsened[,]" and that she "gets white dots in vision (needs glasses)." (Tr. 191) Plaintiff can walk for one-tenth of a mile and rests 5 minutes before resuming walking. (Tr. 189) Plaintiff is able to pay attention for 20 minutes. (Tr. 189) Plaintiff does not finish what she starts, "sometimes" forgets tasks and spoken instructions. (Tr. 189) Plaintiff stated she "developed OCD, anxiety about failing school." (Tr. 190) Plaintiff did not know what medications she was taking for her conditions but stated her only side effect was sweating. (Tr. 190)

### C. Medical Opinion Evidence

#### 1. Physical Impairments

##### a. Dr. Alam's Opinions

Dr. Alam, Plaintiff's treating physician for MG, provided two medical source statements on fill-in-the-blank and checkbox forms. (Tr. 1813, 2411) Dr. Alam's first opinion, dated May 15, 2018, identified Plaintiff's symptoms as fatiguability of muscles following exercise, general fatigue, drooping upper eyelid, and diarrhea. (Tr. 1813) Dr. Alam reported that Plaintiff experienced "significant motor weakness of muscles of extremities on repetitive activities against resistance[,]" explaining that "[j]ust going through the motions of daily living exhaust her muscles." (Tr. 1814) Plaintiff's "fatigue or other symptoms" were severe enough to "constantly" interfere with her attention and concentration. (Tr. 1814) Dr. Alam reported that Plaintiff was "capable of low stress jobs[,]" and would need a job that permitted her to shift positions at will and one daily unscheduled 10-to-15-minute break where she could sit quietly. (Tr. 1815) Dr. Alam estimated Plaintiff would be absent from work about two days per month as a result of her

8

impairments or treatment. (Tr.  1818)  Dr. Alam declined to provide additional functional limitations without the benefit of a "functional capacity test." (Tr.  1815-16)

In his January 2022 opinion, Dr. Alam reported Plaintiff experienced fatiguability of muscles and general fatigue, with symptoms that fluctuate in intensity over the course of hours or days. (Tr.  2411) Plaintiff had neither "significant motor weakness of muscles of extremities on repetitive activity against resistance" nor significant difficulty with speaking, swallowing or breathing while on her prescribed therapy. (Tr.  2412)  Plaintiff's "fatigue and other symptoms" were "frequently" severe enough to interfere with her attention and concentration. (Tr.  2412)

With respect to any limitations would affect Plaintiff's ability to work a regular job on a sustained basis, Dr. Alam stated Plaintiff "had flare-ups [that] can affect her concentration, and cause [Plaintiff] to experience fatigue and weakness associated with her diagnosis." (Tr.  2417) Dr. Alam opined Plaintiff would be absent from work about two days per month due to her impairments and treatment. (Tr.  2416)  Dr. Alam, again, declined to provide further functional limitations without conducting a functional capacity evaluation. (Tr.  2412-2417)

### b.  Dr. Frey's Opinion

At the March 28, 2022 hearing, the ALJ called Lauren Frey, M.D., a board-certified neurologist,  to testify as a medical expert although MG was not her specific area of expertise. (Tr. 1978, 1987) Dr. Frey reviewed Plaintiff's medical history through September 2019. (Tr.  1978, 1980) Dr. Frey testified that Plaintiff had a history of migraine headaches, fatigue, light-headedness, and weakness, but Plaintiff had "no clear diagnosis in the medical records." (Tr.  1978-79) Although Plaintiff had some "positive antibodies" and her physicians have "entertained" multiple diagnosis, including MG and POTS, Dr. Frey stated these diagnoses were not substantiated with diagnostic testing. (Tr.  1978-79, 1982) Dr. Frey testified Plaintiff did not have

9

"a diagnosis that's supported in the record[,]" in that Plaintiff had a "constellation of symptoms[,]" including weakness, light-headedness, and fatigue, but the "etiology has not been identified." (Tr. 1982-1985)

### c.  Dr. Goldstein's Opinion

At the July 2022 hearing, the ALJ called Steven Goldstein, M.D., a board-certified internist and neurologist experienced in treating MG, to testify as a medical expert. (Tr. 1944-1945, 1949) Dr. Goldstein reviewed Plaintiff's medical records and opined that Plaintiff had the severe impairments of MG, extreme obesity, and asthma. (Tr.  1945-46) Plaintiff remaining conditions, including headaches and lupus, were non-severe. (Tr.  1945-46)

Although Plaintiff "reported fatigue throughout the record[,]"Dr. Goldstein stated the treatment notes frequently observed that Plaintiff had "normal" strength or, if there was weakness observed, the weakness was not evaluated or "quantified in any way." (Tr.  1947, 1950-51). Dr. Goldstein testified that it was "very difficult" to determine Plaintiff's functional capacity due to the lack of quantified data in the record but that he was "reasonably confident" that Plaintiff was capable of sedentary activity. (Tr.  1947) Dr. Goldstein included the following additional limitations: sitting for 6 hours in an 8-hour day; standing or walking for 2 hours in an 8-hour day; lifting or carrying 5 pounds frequently and 10 pounds occasionally; avoiding concentrated exposure to pulmonary irritants; no ladders, ropes, or scaffolds; and occasional limits to other postural activities. (Tr.  1948)  Dr. Goldstein stated this was a conservative assessment but, in the absence of tests quantifying Plaintiff's strength, it was difficult for him to determine if Plaintiff could do more than sedentary work. (Tr.  1947-48)

### 2.  Mental Health Impairments

### a.  Dr. Cottone's Opinion

On October 21, 2016, Dr. Robert Cottone, Ph.D., a state-agency non-examining consultant, opined that Plaintiff had the non-severe impairments of affective disorder, anxiety disorder, "organic mental disorder" or autism, and oppositional/defiant disorder. (Tr.  53) Dr. Cottone concluded Plaintiff's medically determinable mental impairments resulted in mild restrictions to her activities of daily living; mild difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence or pace; and no repeated episodes of decompensation. (Tr.  54) In support, Dr. Cottone cited to treatment notes from medical appointments with Plaintiff's mental health provider from July and October 2016, and Plaintiff's subjective complaints and reports. (Tr.  746, 806)

### b.  Dr. Park's Opinion

Dr. Robin Park, M.D., Plaintiff treating physician for Aspergers and anxiety, completed a medical source statement on June 9, 2018. (Tr.  1837-1842) Dr. Park opined that Plaintiff had moderate limitations in her ability to concentrate, persistence, and pace, and no limitations in her ability to understand, remember or apply information and to adapt or manage herself. (Tr.  1837-1842). Dr. Park offered no opinion on Plaintiff's ability to interact with others. (Tr.  1840). Dr. Park stated Plaintiff's "limitations have not been based on psychological illnesses- which are treated[.] She has been [diagnosed] with [MG] according to [Plaintiff.]" (Tr.  1840-41)

### D.  Vocational Expert's Testimony

Vocational expert Mark Anderson testified at the July 2022 hearing. (Tr.  1965) The ALJ asked Mr. Anderson to consider a hypothetical individual with Plaintiff's age and work experience, who has at least a high school education and is able to perform sedentary work with the following limitations:

> stand and/or walk two hours in an eight-hour workday, sit six hours in an eight-hour workday, lift and/or carry five pounds frequently and ten pounds

11

occasionally, never climb ropes, ladders, or scaffolds, occasionally balance, as defined in the DOT, SCO, also occasionally stoop, kneel, crouch, and crawl, avoid concentrated exposure to pulmonary irritants.

(Tr. 1966-67)

Mr. Anderson concluded that such an individual could perform jobs such as patcher, table worker, and touch-up screener. (Tr. 1967) Mr. Anderson testified that more than two absences or tardies per month precluded competitive employment. (Tr. 1967) Mr. Anderson stated there was "no tolerance of ongoing unscheduled breaks" occurring on a regular basis but that a person can be off-task 15% of a workday or 9 minutes per hour during which time a person could walk around or step away from his or her workstation. (Tr. 1968-69) Mr. Anderson advises his clients not to take all of their off-task time at one time, or approximately 72 minutes at once, because it would require the employee to work "100%" the remaining time. (Tr. 1969)

E.  Medical Records

In regard to Plaintiff's medical records, the Court adopts the facts that the Commissioner admitted and that Plaintiff set forth in her statement of material facts. [ECF Nos. 19-1, 25-1] The Court also adopts the additional facts contained in the Commissioner's response to Plaintiff's statement of material facts because Plaintiff did not contest them.[6] [ECF Nos. 25-1].

III.  **Standards for Determining Disability Under the Social Security Act**

Eligibility for disability benefits under the Social Security Act ("Act") requires a claimant to demonstrate that he or she suffers from a physical or mental disability. 42 U.S.C. § 423(a)(1); 42 U.S.C. §1381a.  The Act defines disability as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period

---

[6] Relevant medical records are discussed in detail below.

not less than twelve months." 42 U.S.C. § 1382c (a)(3)(A); See also 20 C.F.R. § 416.905(a).  The impairment must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy ...."  42 U.S.C. § 1382c(a)(3)(B).

To determine whether a claimant is disabled, the ALJ engages in a five-step evaluation process.  See 20 C.F.R. § 416.920(a).  Those steps require a claimant to first show that he or she is not engaged in substantial gainful activity.  Id.  Second, the claimant must establish that he or she has a "severe impairment," defined as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities."  20 C.F.R. § 416.920(a), (c).  "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on [the claimant's] ability to work."  Page v. Astrue, 484 F.3d 1040, 1043 (8th Cir. 2007) (quoting Caviness v. Massanari, 250 F.3d 603, 605 (8th Cir. 2001)). At step three, the ALJ considers whether the claimant's impairment meets or equals an impairment listed in 20 C.F.R., Pt. 404, Subpart P, Appendix 1.  20 C.F.R. § 416.920(a), (d). If the claimant has such an impairment, the Commissioner will find the claimant disabled; if not, the Commissioner proceeds with the rest of the five-step process. 20 C.F.R. § 416.920 (d), (e).

Prior to step four, the Commissioner must assess the claimant's residual functional capacity (RFC), which is "the most a claimant can do despite [his or her] limitations."  Moore v. Astrue, 572 F.3d 520, 523 (8th Cir. 2009) (citing 20 C.F.R. 404.1545(a)(1)); see also 20 C.F.R. §§ 416.920(e), 416.945(a)(1).  RFC is "based on all relevant evidence including the medical records, observations of treating physicians and others, and an individual's own description of his [or her] limitations."  Id. (quoting Lacroix v. Barnhart, 465 F.3d 881, 887 (8th Cir. 2006)).

13

At step four, the ALJ determines whether the claimant can return to his or her past relevant work by comparing the claimant's RFC with the physical and mental demands of the claimant's past relevant work.  20 C.F.R. § 416.920(a), (f); see McCoy v. Astrue, 648 F.3d 605, 611 (8th Cir. 2011). If the claimant can still perform past relevant work, the claimant will not be found to be disabled; if the claimant cannot, the analysis proceeds to the next step.  McCoy, 648 F.3d at 611; 20 C.F.R. § 416.920(f).

Through step four, the burden remains with the claimant to prove that he or she is disabled. Moore, 572 F.3d at 523. At step five, the burden shifts to the Commissioner to establish that, given the claimant's RFC, age, education, and work experience, there are a significant number of other jobs in the national economy that the claimant can perform. 20 C.F.R §§ 416.920(a), (g); 416.960(c);  Brock v. Astrue, 674 F.3d 1062, 1064 (8th Cir. 2012). If the claimant cannot make an adjustment to other work, then he or she will be found to be disabled.  20 C.F.R. § 416.920(g).

## IV.    ALJ's Decision

Applying the five-step evaluation process, the ALJ found Plaintiff: (1) had not engaged in substantial gainful activity since January 1, 2012, the onset date; and (2) had the severe impairments of MG, asthma, and extreme obesity. (Tr. 1916)  The ALJ concluded Plaintiff had the non-severe impairments of headaches, herpes simplex, lupus, anxiety, and Asperger's disorder. (Tr.  1916-1919)  The ALJ completed the psychiatric review technique prescribed by the regulations for assessing the severity of Plaintiff's mental impairments.[7] In doing so, the ALJ

---

[7] When a claimant has a mental impairment, the Social Security Act requires the ALJ to employ the psychiatric review technique when evaluating the severity of the claimant's mental impairments. Cuthrell v. Astrue, 702 F.3d 1114, 1117 (8th Cir. 2013) (citing 20 C.F.R. § 404.1520a(a), 416.920a(a)). The psychiatric review technique requires the Commissioner to "first evaluate [the claimant's] pertinent symptoms, signs, and laboratory findings to determine whether [the claimant has] a medically determinable mental impairment(s)." Id. at 1118 (citing 20 C.F.R. §§ 404.1520a(b)(1), 416.920a(b)(1)). The Commissioner then rates "the degree of functional limitation" in the following four broad functional areas:

considered the medical records, Dr. Cottone's and Dr. Park's medical opinions, and Plaintiff's

testimony and self-reported activities of daily living, and concluded that Plaintiff had: (1) no

limitation in the functional areas of understanding, remembering, or applying information and of

interacting with others, and (2) mild limitation in the areas of concentrating, persisting, or

maintaining pace and of adapting or managing oneself. (Tr. 1917-1919)

At step three, the ALJ determined Plaintiff did not have an impairment or combination of

impairments that met or medically equaled the severity of one of the listed impairments in 20

C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 1919) The ALJ determined Plaintiff had the RFC to

perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) with the following

additional exertional and non-exertional limitations:

> stand and/or walk 2 hours in an 8-hour workday, sit 6 hours in an 8-hour workday;
> lift and/or carry 5 pounds frequently and 10 pounds occasionally. Never climb
> ropes, ladders, and scaffolds. Occasionally balance (as defined in the DOT/SCO),
> stoop, kneel, crouch, and crawl. Avoid concentrated exposure to pulmonary
> irritants.

(Tr. 1920)

In making this assessment, the ALJ considered Plaintiff's reported conditions and

symptoms, and found Plaintiff's medically determinable impairments could reasonably be

expected to cause some of her alleged symptoms but that her statements concerning the intensity,

persistence, and limiting effects of these symptoms were not entirely consistent with the medical

evidence and other evidence in the record. (Tr. 1920-22) In support, the ALJ considered Plaintiff's

subjective complaints and the medical records and opinions related to Plaintiff's impairments. (Tr.

1920-1927)

---

(1) understand, remember, or apply information; (2) interact with others; (3) concentrate, persist, or
maintain pace; and (4) adapt or manage oneself.  20 C.F.R. §§ 404.1520a(c), 416.920a(c).

15

The ALJ found the May 2018 opinion of Dr. Alam, Plaintiff's treating physician for MG, that Plaintiff suffered from fatiguability of the muscles following exercise was not persuasive because the record did not reflect muscle fatigue. (Tr. 1925) The ALJ noted that Plaintiff typically had 5/5 muscle strength in her upper and lower extremities and "any reduction or weakness is not noted or quantified" by Dr. Alam. (Tr. 1925) The ALJ gave Dr. Alam's January 2022 medical opinion "some weight" because of the length of his treating relationship with Plaintiff but, again, noted that Plaintiff typically had 5/5 muscle strength in her upper and lower extremities and any reduction or weakness was not noted or quantified. (Tr. 1925-1926) The ALJ observed that neither of Dr. Alam's medical source statements included an opinion regarding Plaintiff's functional limitations and that the limitations he did present, specifically that Plaintiff needed to change positions at will, needed one unscheduled 10-to-15 minute break a day, and would be absent from work two days per month, did not preclude competitive employment pursuant to the vocational expert's testimony. (Tr. 1925-1926).

The ALJ gave Dr. Goldstein's opinion that Plaintiff was capable of sedentary work "great weight" because he had experience treating patients with MG and his opinion was supported by the other evidence in the record demonstrating that Plaintiff had 5/5 muscle strength in her upper and lower extremities and that "any reduction or weakness is not noted or quantified[.]" (Tr. 1926-1927)

At step four, the ALJ found that Plaintiff had no past relevant work. (Tr. 1927) Based on the RFC, Plaintiff's age, education, and prior work experience, and the vocational expert's testimony, the ALJ found Plaintiff was able to perform jobs that existed in significant numbers in the national economy, such as patcher, table worker, and touch up screener. (Tr. 1928) The ALJ therefore concluded Plaintiff was not disabled. (Tr. 1929)

16

## V.      Discussion

Plaintiff argues the ALJ's RFC determination is not supported by substantial evidence in that (1) the ALJ failed to properly evaluate the medical opinion evidence, (2) the ALJ failed to include an explanation of how the evidence supports the RFC, and (3) ALJ erred in concluding that Plaintiff's headaches and "various mental health impairments" were not severe. [ECF No. 19]

The Commissioner responds that the ALJ properly evaluated the medical opinion evidence and that the RFC reflects the ALJ's consideration of Plaintiff's credible work-related limitations and was supported by substantial evidence in the record. [ECF No. 25] The Commissioner also contends that the ALJ conducted a proper analysis at step two of the sequential evaluation and that even if the ALJ did error in finding some of Plaintiff's conditions were non-severe, the error was not prejudicial because the ALJ considered Plaintiff's severe and non-severe impairments in determining Plaintiff's RFC. [ECF No 25]

### A.  Standard of Judicial Review

A court must affirm an ALJ's decision if it is supported by substantial evidence. 42 U.S.C. § 405(g). "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Chesser v. Berryhill, 858 F.3d 1161, 1164 (8th Cir. 2017) (quoting Prosch v. Apfel, 201 F.3d 1010, 1012 (8th Cir. 2000)). A court must consider "both evidence that supports and evidence that detracts from the ALJ's determination, [but it] may not reverse the Commissioner's decision merely because substantial evidence supports a contrary outcome." Id. (quoting Prosch, 201 F.3d at 1012) (internal quotation marks omitted).

A court does not "reweigh the evidence presented to the ALJ, and [it] defer[s] to the ALJ's determinations regarding the credibility of testimony, as long as those determinations are

supported by good reasons and substantial evidence." <u>Renstrom v. Astrue</u>, 680 F.3d 1057, 1064 (8th Cir. 2012) (quoting <u>Gonzales v. Barnhart</u>, 465 F.3d 890, 894 (8th Cir. 2006)). Therefore, a court must affirm the ALJ's decision if "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings[.]" <u>Wright v. Colvin</u>, 789 F.3d 847, 852 (8th Cir. 2015) (quoting <u>Perkins v. Astrue</u>, 648 F.3d 892, 897 (8th Cir. 2011)).

     B.  <u>Evaluation of Medical Opinion Evidence</u>

     Plaintiff contends the ALJ failed to properly evaluate the medical opinion testimony offered as to both her mental and physical impairments. [ECF No. 19] Plaintiff argues the ALJ erred by: (1) failing to evaluate and ascribe a weight to Dr. Fray's opinion, (2) affording Dr. Goldstein's opinion "great weight," and (3) failing to afford Dr. Alam's opinions controlling weight under the treating physician rule.[8] [ECF No. 19] With respect to her mental impairments, Plaintiff contends the ALJ erred in affording "significant weight" to Dr. Cottone's opinion. [ECF No. 19] The Commissioner counters that the ALJ properly applied the treating physician rule and considered the relevant factors under the regulations in evaluating the medical opinions in the record. [ECF No. 25]

     An ALJ must evaluate every medical opinion contained in the record. 20 C.F.R. § 404.1527(c); 416.927(c). Unless the ALJ assigns controlling weight to a treating physician's opinion, the ALJ must explain the weight given to every medical opinion of record, regardless of its source. <u>See</u> 20 C.F.R. § 404.1527(c); 416.927(c). When determining the appropriate amount of

---

[8] On January 18, 2017, SSA published revisions to its regulations regarding the evaluation of medical evidence. However, the prior regulations at 20 C.F.R. §416.927 regarding consideration of medical opinions applies here because Plaintiff filed her DAC benefits claim prior to March 27, 2017. See Hearings, Appeals, and Litigation Manual (HALLEX) I-5-3-30.IV, https://www.ssa.gov/OP_Home/hallex/I-05/I-5-3-30.html (providing that the ALJ shall apply the "Prior rules for both claims" when the claimant files a Title II claim before March 27, 2017 and a title XVI claim on or after March 27, 2017).

weight to give a medical opinion from a non-treating source, the ALJ considers the following factors: examining relationship, length of treatment, treatment relationship, supportability, consistency, specialization, and other relevant factors.  20 C.F.R. §404.1527(c); 416.927(c).  Wiese v. Astrue, 552 F.3d 728, 731 (8th Cir. 2009). "The ALJ may reject the conclusions of any medical expert, whether hired by the claimant or the government, if they are inconsistent with the record as a whole."  Wagner, 499 F.3d at 848 (quoting Pearsall, 274 F.3d at 1219).

   a. Lauren Frey, MD

Plaintiff contends the ALJ violated the regulations by failing to evaluate and ascribe a weight to Dr. Frey's medical opinion. The Commissioner argues the ALJ did not err because Dr. Frey "did not give an opinion on Plaintiff's RFC." [ECF No. 25]

At the March 28, 2022 hearing, the ALJ called Dr. Frey, a board-certified neurologist, to testify as a medical expert. (Tr.  1978)  Dr. Frey testified that MG is not her specific area of expertise and that she currently treated no patients with the condition. (Tr.  1987). Dr. Frey observed that Plaintiff had a history of migraine headaches, fatigue, light-headedness, and weakness, but Plaintiff had "no clear diagnosis in the medical records" and that Dr. Alam's MG diagnosis was not substantiated by the record.  (Tr.  1978-1979)  Dr. Frey testified she did not have "a diagnosis that's supported in the record[,]" in that Plaintiff had a "constellation of symptoms" but the "etiology has not been identified." (Tr.  1984-85)

The ALJ responded that she was taken "off-guard" by Dr. Frey's testimony because it was "not the answer that [she] expected[.]" (Tr.  1984-85) The ALJ concluded the hearing early, stating she wanted to find a neurologist with a background in MG to provide additional information and guidance. (Tr.  2005-07) At the hearing in July 2022, the ALJ received the testimony of Dr. Goldstein, a board-certified neurologist with experience treating patients with MG.

19

Plaintiff is correct that the ALJ did not identify and explain the weight she assigned Dr. Frey's opinion in the determination. However, an ALJ's failure to specify the particular weight placed on a medical opinion does not constitute reversible error if it did not affect the outcome of the case. Wilson v. Berryhill, No. 4:16-CV-1492-CAS, 2018 WL 4636174, at * 7 (E.D. Mo. Sept. 27, 2018) (citing McCadney v. Astrue, 519 F.3d 764, 767 (8th Cir. 2008)).

Although the ALJ's determination did not assign a specific weight to Dr. Frey's opinion that Plaintiff did not have a medically supported diagnosis, it is clear from the ALJ's statements at the hearing that the ALJ found Dr. Frey's opinion to be unpersuasive in light of Dr. Frey's inexperience with MG. The ALJ's decision to conclude the March 2022 hearing early in order to obtain additional testimony from an expert experienced with treating MG is a clear indicator that the ALJ did not find Dr. Frey's testimony to be persuasive. Further, the ALJ's finding that Plaintiff had the severe impairment of MG based on the other medical opinions in the record, and in opposition to Dr. Frey's testimony, demonstrates that the ALJ did not rely on, or assign any weight to Dr. Frey's opinion.

   b. Steven Goldstein, MD

Plaintiff contends the ALJ erred in affording Dr. Goldstein's opinion "great weight" because he did not explain how the evidence supported a finding that Plaintiff was capable of sedentary work and, as a non-examining physician, his opinion was entitled to only "little weight." Plaintiff also argues that Dr. Goldstein's testimony was internally inconsistent and improperly relied upon a lack of testing by Plaintiff's treating physician. The Commissioner asserts that the ALJ's decision to grant Dr. Goldstein's opinion "great weight" is supported by substantial evidence. [ECF No. 25]

Dr. Goldstein is a board-certified internist and neurologist with experience in treating MG.[9] (Tr.  1944-45, 1949) Dr. Goldstein reviewed Plaintiff's medical records and opined that Plaintiff had the severe impairments of MG, extreme obesity, and asthma. (Tr.  1945-46) Plaintiff's remaining conditions, including headaches and lupus,[10] were non-severe. (Tr.  1945-46)

Dr. Goldstein stated the "most common complaint" with MG was muscle weakness or muscular fatigue, meaning the individual's "weakness gets worse" throughout the day and that the muscle weakens with exercise.[11] (Tr. 1947, 1949-50) Muscle fatigue is "typically" evaluated in MG patients through the use of repetitive testing to determine if strength lessens with use.[12] (Tr. 1951) Usually a person with MG would be "better" in the morning and "worse off" in the afternoon, and "might have trouble, for instance, sitting up for a long period of time or standing for a long period of time." (Tr.  1951-52).

Despite Plaintiff's complaints of fatigue, Dr. Goldstein noticed a lack of "any evaluation of the fatigue in the record." (Tr.  1950-51) Dr. Goldstein also noted that the treatment notes

---

[9] Dr. Goldstein currently treats approximately 20 patients with MG. (Tr.  1949)

[10] With respect to Plaintiff's lupus diagnosis, Dr. Goldstein found this impairment was non-severe "whether that diagnosis was confirmed or not." (Tr.  1945) Dr. Goldstein noted that the results of the antibody test on which the lupus diagnosis was based was "borderline" and that other testing was "normal." (Tr.  1945) Dr. Goldstein explained that a person with an autoimmune disease like MG "may frequently have abnormalities in some of these tests." (Tr.  1945)

[11] Dr. Goldstein testified that general fatigue is associated with cardiovascular or mental conditions and not with MG.  (Tr.  1950, 1954-55)

[12] Dr. Goldstein presented the hypothetical of evaluating a person's grip. (Tr.  1951) He stated the doctor would have the patient squeeze the doctor's hand and stated, "typically, a myasthenic might have…a perfectly normal grip when they squeeze…[but a]fter about 10 or 15 squeezes, a lot of time, a myasthenic can't squeeze or can squeeze very, very weakly." (Tr.  1951) Dr. Goldstein also gave the example of a 25-foot walk test, in which the doctor would time the patient while walking 25 feet and then compare the results to past tests. (Tr.  1953)

frequently observed that Plaintiff had "normal" strength or, if there was weakness, the weakness was "not quantified in any way."[13] (Tr.  1947).

Dr. Goldstein testified that it was "very difficult" to determine Plaintiff's functional capacity based on the record, due to the lack of quantified data, but that he was "reasonably confident" that Plaintiff was capable of sedentary activity. (Tr.  1947) Dr. Goldstein included the following additional limitations: sitting for 6 hours in an 8-hour day, standing or walking for 2 hours in an 8-hour day, lifting or carrying 5 pounds frequently and 10 pounds occasionally, avoiding concentrated exposure to pulmonary irritants; no ladders, ropes, or scaffolds; and other postural activities are occasional. (Tr.  1948)  Dr. Goldstein stated that this was his conservative assessment and, in the absence of tests quantifying Plaintiff's strength, it was difficult for him to determine if Plaintiff could do more than sedentary work. (Tr.  1947-48)

The ALJ gave Dr. Goldstein's opinion "great weight" based on his opportunity to review the entire record, his experience in treating MG, and its support "by the remainder of the evidence of record that demonstrates typically [Plaintiff] has 5/5 muscle strength in her upper and lower extremities, any reduction or weakness is not noted or quantified." (Tr.  1927)

Plaintiff argues the ALJ erred in affording Dr. Goldstein's opinion, as a non-examining physician, "great weight" because the opinions of non-examining physicians are categorically

---

[13] Dr. Goldstein observed similar deficiencies in the evaluation of Plaintiff's response to treatments, stating:

> I saw a quote [in the medical records that] there was exacerbation [when] she was given IVIG. But looking at the physical examinations, I couldn't even tell there was an exacerbation, from looking at the exams. It's just the doctor said, the patient's having an exacerbation. She's responding well to IVIG. But the exams from one time to the other don't show any difference. So, I couldn't tell. And normally…that's not something you would do like on a continuous basis all the time.

(Tr.  1952-53)

entitled to only "little weight." [ECF No. 19] The regulations, however, require the ALJ to evaluate every medical opinion in the record and to consider multiple factor in determining the appropriate amount of weight to give a medical opinion, including: examining relationship, length of treatment, treatment relationship, supportability, consistency, specialization, and other relevant factors.  20 C.F.R. §404.1527(c); 416.927(c); <u>Wiese v. Astrue</u>, 552 F.3d 728, 731 (8th Cir. 2009). Here, the ALJ did precisely that, considering Dr. Goldstein's experience and specialization, his review of the entire record, and the consistency of his opinion with the medical evidence in the record. (Tr.  1927)

Plaintiff further contends that Dr. Goldstein's opinion was "general and conclusory without any explanation of how the evidence supported the ability to perform work at the sedentary level." [ECF No. 19] Sedentary work is defined "as one which involves sitting" with occasional standing or walking, and lifting no more than 10 pounds at a time with occasional lifting or carrying small items. See 20 C.F.R. § 404.1567(a), 416.967(a). Based upon his review of Plaintiff's medical records, Dr. Goldstein opined that Plaintiff was capable of sedentary work, with additional limitations.[14]  (Tr. 1944-45, 1947-48))

Dr. Goldstein testified that the "most common complaint" with MG was muscular fatigue, meaning the individual's "weakness gets worse as time goes on" or throughout the day and a muscle weakens with exercise. (Tr. 1947, 1949-50). In offering his medical opinion, Dr. Goldstein observed that, although Plaintiff consistently reported experiencing fatigue, the treatment notes frequently reflect that Plaintiff possessed normal strength and that any reported weakness or fatigue was not evaluated or quantified. (Tr.  1947, 1950-91)

---

[14] Again, Dr. Goldstein included the additional limitations of sitting for 6 hours in an 8-hour day; standing or walking for 2 hours in an 8-hour day; lifting or carrying 5 pounds frequently and 10 pounds occasionally; avoiding concentrated exposure to pulmonary irritants; no ladders, ropes, or scaffolds; and occasional limitations on other postural activities. (Tr.  1948)

This observation is supported by substantial evidence in the record. Dr. Alam's treatment notes consistently observed that Plaintiff has "5/5 full strength" or "normal strength" in all of her extremities. (Tr. 992, 1018, 1132, 1166, 1200, 1219) Although Dr. Alam occasionally noted that Plaintiff's motor strength was "symmetric but weak in all extremities," nothing in his treatment notes quantifies these weaknesses. (Tr. 1309, 1375, 1419, 1883, 3171) Although Plaintiff's symptoms included "fatiguability of muscle," Dr. Alam's 2022 medical opinion states that Plaintiff did not have significant motor weakness on repetitive activity. (Tr. 2412)

Plaintiff's other medical providers also consistently observed that Plaintiff exhibited normal strength in her extremities. (Tr. 1460, 1562, 1598, 1649, 1704, 1749, 2266) This includes Roula Al-Dahhak, M.D., who Plaintiff saw for a second opinion regarding treatment for MG. (Tr. 2741, 2745) Dr. Al-Dahhak questioned the accuracy of the MG diagnosis because some of Plaintiff's symptoms were not currently occurring, were not associated with MG, or were consistent with some other cause. (Tr. 2741, 2745) Dr. Al-Dahhak repeatedly observed that Plaintiff exhibited "5/5" or full muscle strength and found that her strength was "appropriate for her age." (Tr. 2748, 2786, 2812, 2916, 2936, 2788)

Here, Dr. Goldstein acknowledged that the lack of quantified data rendered an RFC determination difficult but concluded, based on the medical records demonstrating normal strength or unquantified weakness, that Plaintiff could perform at the sedentary level. (Tr. 1947-48) Notably, Dr. Goldstein testified that, in the absence of tests quantifying Plaintiff's strength, it was difficult for him to determine if Plaintiff could do *more* than sedentary work. (Tr. 1947) Thus, Dr. Goldstein's opinion that Plaintiff was capable of, at least, sedentary work based on the medical records demonstrating either no loss of muscle strength or unspecified weakness was supported by the record.

24

Plaintiff contends that Dr. Goldstein's testimony was internally inconsistent "as he testified that an individual with muscle fatigue would have increased weakness with repetitive use of the muscle, but then indicated that they would only have limited ability to stand or sit." [ECF No. 19] Plaintiff's misrepresents Dr. Goldstein's testimony. While Dr. Goldstein testified that a person with muscle fatigue would have increased weakness with repetitive use, he did not testify that this person "would only have limited ability to stand or sit." Instead, he used the limited ability to stand or sit as an example of the kinds of limitations that could be caused by muscle fatigue from MG, stating "[t]he…fatigue would be a muscular fatigue. So somebody might have trouble, for instance, sitting up for a long period of time or standing for a long period of time….[I]t would be that kind of fatigue." (Tr.  1951-52)

Plaintiff also argues that Dr. Goldstein improperly relied on a lack of testing, arguing he "relies heavily on a lack of testing that would have been performed by an examining doctor and would provide an actual basis for the RFC rather than basing the RFC on a lack of testing that the particular doctor requires." [ECF No. 19] Again, Plaintiff misconstrues Dr. Goldstein's testimony. Dr. Goldstein testified that the lack of testing and quantified results made it "very difficult" to determine Plaintiff's functional capacity but that he was "reasonably confident" that Plaintiff was capable of sedentary activity based on the medical records. (Tr.  1947-48)  Dr. Goldstein testified he could not determine whether Plaintiff could do more than sedentary work, i.e., whether Plaintiff had less functional restrictions, in the absence of tests quantifying Plaintiff's muscle strength. (Tr. 1947) To the extent that it can be said that Dr. Goldstein's RFC assessment is based on a lack of testing, the result was a more restrictive RFC.

     c.   Tariq Alam, MD

Plaintiff contends the ALJ erred by failing to give Dr. Alam's medical opinions controlling weight. [ECF No. 19] Specifically, Plaintiff asserts the ALJ failed to properly apply the treating physician rule or "properly explain how the factors of supportability and consistency were considered or how a lack of muscle fatigue with 5/5 strength are inconsistent with Dr. Alam's findings[.]" Plaintiff further contends that, to the extent the ALJ "believed that [Dr. Alam's] notes and opinions were of no value," the ALJ was obligated to "contact [Dr. Alam] for 'additional evidence or clarification'" and "'for an assessment of how the impairments limited Plaintiff's ability to engage in work-related activities.'" Plaintiff asserts that the ALJ erred in finding that the limitations established by Dr. Alam's opinion did not preclude competitive work.

The Commissioner counters that the ALJ properly considered the relevant factors in assessing thew weight of Dr. Alam's opinions. [ECF No. 25] The Commissioner further asserts that the evidence in the record was adequate from the ALJ to make an informed decision and, therefore, was the ALJ was not required to obtain additional medical evidence from Dr. Alam. [ECF No. 25]

A treating physician's opinion regarding a claimant's impairments is entitled to controlling weight where "the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record." Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000). Even if the opinion is not entitled to controlling weight, it should not ordinarily be disregarded and is entitled to substantial weight. Id. This rule is premised, at least in part, on the notion that the treating physician is usually more familiar with a claimant's medical condition than are other physicians. See 20 C.F.R. §§ 404.1527, 416.927; Thomas v. Sullivan, 928 F.2d 255, 259 n.3 (8th Cir. 1991).

26

If an ALJ declines to give controlling weight to a treating physician's opinion, the ALJ must consider the following factors in determining the appropriate weight:  length and frequency of the treatment relationship; nature and extent of the treatment relationship; evidence provided by the source in support of the opinion; consistency of the opinion with the record as a whole; and the source's level of specialization.  20 C.F.R. §§ 404.1527(c), 416.927(c).  Whether the ALJ grants a treating physician's opinion substantial or little weight, "[t]he regulations require that the ALJ 'always give good reasons' for the weight afforded to a treating physician's evaluation." Reed v. Barnhart, 399 F.3d 917, 921 (8th Cir. 2005) (quoting 20 C.F.R. § 404.1527(d)(2)).

Dr. Alam has been Plaintiff's treating physician for MG since November 2016 and provided two medical source statements on fill-in-the-blank and checkbox forms. (Tr. 1813, 2411). Dr. Alam diagnosed Plaintiff with MG on the basis of "blood work positive for acetylcholine receptor binding AB"[15] combined with "fatigue, tiredness, and one eyelid ptosis." (Tr.  1813, 2411).

Dr. Alam's first opinion, dated May 15, 2018, identified Plaintiff's symptoms as fatiguability of muscles following exercise, general fatigue, drooping upper eyelid, and diarrhea. (Tr.  1813) While on prescribed therapy, Plaintiff did not experience significant difficulty with speaking, swallowing, or breathing. (Tr.  1813) Dr. Alam reported that Plaintiff experienced "significant motor weakness of muscles of extremities on repetitive activities against resistance[,]" explaining that "[j]ust going through the motions of daily living exhaust her muscles." (Tr.  1814). Plaintiff's symptoms fluctuate in intensity over the course of hours or days and she experiences "good days" and "bad days." (Tr.  1813, 1818) Plaintiff's "fatigue or other symptoms" were severe enough to "constantly" interfere with her attention and concentration. (Tr.  1814) Dr. Alam opined

---

[15] Dr. Alam noted that the blood work was "positive" for lupus as well.  (Tr.  1813)

that Plaintiff was "capable of low stress jobs[,]" and would need a job that permitted shifting positions at will and one daily unscheduled 10-to-15 minute break where she could sit quietly. (Tr. 1815)  Dr. Alam estimated Plaintiff would be absent from work about two days per month as a result of her impairments or treatment. (Tr.  1818)  Dr. Alam declined to provide additional functional limitations without the benefit of a "functional capacity test." (Tr.  1815-16)

In his January 2022 opinion, Dr. Alam reported Plaintiff experienced fatiguability of muscles and general fatigue, with symptoms that fluctuate in intensity over the course of hours or days. (Tr.  2411) Plaintiff's "fatigue and other symptoms" were "frequently" severe enough to interfere with her attention and concentration. (Tr.  2412) However, Plaintiff had neither "significant motor weakness of muscles of extremities on repetitive activity against resistance" nor significant difficulty with speaking, swallowing or breathing while on her prescribed therapy. (Tr. 2412)

With respect to any limitations that would affect Plaintiff's ability to work a regular job on a sustained basis, Dr. Alam stated Plaintiff "had flare-ups [that] can affect her concentration, and cause [Plaintiff] to experience fatigue and weakness associated with her diagnosis." (Tr.  2417) Dr. Alam opined that Plaintiff's impairments would produce "good days" and "bad days" and that Plaintiff would be absent from work about two days per month due to her impairments and treatment. (Tr.  2416)  Dr. Alam, again, declined to provide further functional limitations without conducting a functional capacity evaluation. (Tr.  2412-2417)

The ALJ found Dr. Alam's May 2018 opinion that Plaintiff suffered from fatigability of the muscles following exercise to be "not persuasive." (Tr.  1925) The ALJ noted, consistent with Dr. Goldstein's testimony, that the record did not reflect muscle fatigue, in that Plaintiff typically had 5/5 muscle strength in her upper and lower extremities and "any reduction of strength or

weakness was not noted or quantified." (Tr.  1925) In support of her conclusion, the ALJ cited to the medical records of Dr. Alam and other providers. (Tr.  1925)  Further, the ALJ concluded that the only limitations imposed by Dr. Alam, including that Plaintiff would need to shift positions at will, would need one unscheduled 10-to-15 minute break, and would miss two days per month, were "allowable per the testimony of the vocational expert." (Tr.  1925)

The ALJ gave Dr. Alam's January 2022 opinion "some weight" because of his treating relationship with Plaintiff "for a number of years." (Tr.  1926).  The ALJ again noted that Plaintiff typically had full muscle strength in her upper and lower extremities and that any reduction of strength or weakness was not noted or quantified. (Tr.  1926) The ALJ found that the only limitation by Dr. Alam, that Plaintiff was likely to be absent for two days of work per month, was "allowable per the testimony of the vocational expert." (Tr.  1926)

Plaintiff contends the ALJ erred by failing to give controlling weight under the treating physician rule to Dr. Alam's medical opinions that Plaintiff suffered from fatigability of muscles because his opinions were "well supported by medically accepted clinical and laboratory diagnostic techniques" and were consistent with the medical records, Plaintiff's reports, and the MG diagnosis.[16] Plaintiff further contends the ALJ failed to "properly explain how the factors of supportability and consistency were considered or how a lack of muscle fatigue with 5/5 strength are inconsistent with Dr. Alam's findings."

Contrary to Plaintiff's assertion, the ALJ did consider the relevant factors, including supportability and consistency, in evaluating Dr. Alam's opinions. While the ALJ gave Dr. Alam's

---

[16]   The ALJ clearly afforded portions of Dr. Alam's opinions some weight because she accepted Dr. Alam's MG diagnosis. As already noted, the record demonstrates that Dr. Al-Dahhak questioned the MG diagnosis and that Dr. Frey concluded that Dr. Alam's diagnosis of MG was unsubstantiated. (Tr. 2741, 2745, 1978-1979) Ultimately, the ALJ concluded that Plaintiff had the severe impairment of MG consistent with Dr. Alam's and Dr. Goldstein's opinions.

2022 opinion "some weight" in consideration of the length of the treatment relationship. (Tr. 1926) However, the ALJ noted that both of Dr. Alam's medical opinions with respect to Plaintiff's muscle fatigue were not supported by the treatment notes of Dr. Alam and was inconsistent with the other medical evidence of record. (Tr. 1925-26)

This finding by the ALJ is supported by substantial evidence in the record.  As already noted, Dr. Alam's treatment notes consistently observed that Plaintiff has "5/5 full strength" or "normal strength" in all of her extremities.  (Tr. 992, 1018, 1132, 1166, 1200, 1219) Dr. Alam occasionally noted that Plaintiff's motor strength was "symmetric but weak in all extremities," however, nothing in his treatment notes quantifies this weakness.  (Tr. 1309, 1375, 1419, 1883, 3171) In his 2022 medical source statement, Dr. Alam concluded that Plaintiff did not exhibit significant motor weakness on repetitive activity while on prescribed therapy. (Tr. 2411- 2412)

Furthermore, Plaintiff's other medical providers consistently observed that Plaintiff displayed normal strength in her extremities. (Tr. 1460, 1562, 1598, 1649, 1704, 1749, 2266) Dr. Al-Dahhak questioned the accuracy of the MG diagnosis because some of Plaintiff's symptoms were not currently occurring, were not associated with MG, or were consistent with some other cause. (Tr. 2741, 2745). Dr. Al-Dahhak repeatedly observed that Plaintiff exhibited "5/5" or full muscle strength and found that her strength was "appropriate for her age." (Tr. 2748, 2786, 2812, 2916, 2936, 2788). The medical records also reflect that Plaintiff did not consistently report experiencing muscle weakness to Dr. Alam or her other medical providers. See (Tr. 1178, 1211, 1306, 1331, 1372, 1415, 1438, 1504)(Plaintiff reported muscle weakness to her medical provider) and (Tr. 1110, 1146, 1387, 1461, 1900, 2810, 3219, 3250, 3282, 3314) (Plaintiff did not report experiencing muscle weakness to her medical provider).

The ALJ's decision to discount Dr. Alam's opinions with respect to Plaintiff's muscle fatigue was also based upon the testimony of Dr. Goldstein who observed that Dr. Alam's treatment notes frequently reflected normal strength. The ALJ gave Dr. Goldstein's opinion "great weight" based on his opportunity to review the entire record, his experience in treating MG, and the consistency of his opinion with "the remainder of the evidence of record" demonstrating that Plaintiff typically exhibits full muscle strength and any reduction or weakness was not quantified. (Tr.  1927)

Thus, the record demonstrates that the ALJ considered the relevant factors in assessing Dr. Alam's opinions and, after considering the record as a whole, determined that Dr. Alam's opinions should not be afforded controlling weight. The ALJ provided adequate reasons for her evaluation of Dr. Alam's opinions, including that Dr. Alam's conclusions were unsupported by his treatment notes and were inconsistent with other evidence in the record. Here, the ALJ's explanation of the lack of supportability and inconsistencies with the other evidence is sufficient reason to discount the weight given to Dr. Alam's opinions.

Moreover, Plaintiff has failed to establish any prejudice as a result of the alleged error because the only restrictions noted by Dr. Alam did not preclude competitive employment. In 2018, Dr. Alam stated Plaintiff would need to shift positions at will, would require one 10-to-15 minute unscheduled break a day to sit quietly, and would miss approximately 2 days of work per month. (Tr.  1813-1818) Dr. Alam stated Plaintiff was "[c]apable of low stress jobs." (Tr.  1814) In 2022, Dr. Alam opined only that Plaintiff would miss approximately 2 days of work per month as result of her condition and treatment. (Tr.  2411-2417) On both occasions, Dr. Alam declined to provide any additional functional limitations without the benefit of a functional capacity

evaluation. (Tr.  1814, 2412) The ALJ found that Dr. Alam's restrictions did not preclude competitive employment "per the testimony of the vocational expert." (Tr.  1925, 1926)

Plaintiff claims the ALJ erred in finding that taking one unscheduled 10-to-15 minute break a day did not preclude competitive employment because the vocational expert testified that an individual could be off task only up to 9 minutes in an hour. [ECF No. 19] Plaintiff again mischaracterizes the testimony. Mr. Anderson testified employers had "no tolerance of ongoing unscheduled breaks" occurring on a regular basis. (Tr.  1969)  He stated that a person can be off-task 15% of a workday or 9 minutes per hour and that he recommended that employees not to take all of their off-task time, or approximately 72 minutes in an 8-hour day, at once because then the employee would need to work "100%" of the remaining time. (Tr.  1968-1969)  Mr. Anderson's testimony was not that a person can be off-task only 9 minutes of any given hour, thereby precluding a person from taking any break exceeding that time, but that a person can be off-task for up to 15% of the workday regardless of how the time is actually taken. Here, the ALJ's finding that Plaintiff's need to take a single, unscheduled 10-to-15 minute break in an 8-hour workday does not preclude competitive employment is supported by the vocational expert's testimony.

Plaintiff also argues that, in the absence of the functional capacity evaluation by Dr. Alam, the ALJ was required to seek "additional evidence or clarification" from Dr. Alam in the form of "an assessment of how the impairments limited Plaintiff's ability to engage in work-related activities." The ALJ "has a duty to fully and fairly develop the evidentiary record." Byes v. Astrue, 687 F.3d 913, 915-16 (8th Cir. 2012). In some cases, the duty to develop the record requires the ALJ to obtain medical evidence, such as a consultative examination of the claimant, before rendering a decision. See 20 C.F.R. §404.1519a(b). "The ALJ is required to order medical examinations and tests only if the medical records presented to him do not give sufficient medical

evidence to determine whether the claimant is disabled." McCoy, 648 F.3d at 612. "[I]t is reversible error for an ALJ not to order a consultative examination when such an evaluation is necessary for him to make an informed decision." Freeman v. Apfel, 208 F.3d 687, 692 (8th Cir. 2000) (quoting Reeves v. Heckler, 734 F.2d 519, 522 n. 1 (11th Cir.1984)).

In her first appeal, the federal court directed the ALJ on remand to "obtain additional medical evidence regarding Plaintiff's physical limitations[.]" (Tr. 2034-35) At the March 2022 hearing following remand, the ALJ called Dr. Frey, a non-examining consultant, to testify regarding Plaintiff's physical impairments. After learning that Dr. Frey was not experienced in treating MG, the ALJ expressed the need to find a neurologist with a background in treating MG and concluded the hearing early. (Tr. 2005)

At that time, the ALJ inquired of Plaintiff's counsel whether Dr. Alam "normally" treated MG and expressed her concern about the "completeness" of Dr. Alam's medical source statement because Dr. Alam did not "put a lot of limitations on her[.]" (Tr. 2005-2006) Plaintiff's counsel stated she could "try and get another – some more information from Dr. Alam…about the [MG] diagnosis."[17] (Tr. 2006) The ALJ concluded the hearing by reiterating that she wanted additional information and wanted to find "an expert on this…to give us more guidance[.]" (Tr. 2007)

At the following hearing, the ALJ called Dr. Goldstein, a board-certified neurologist experienced in treating MG who testified as to the symptoms, evaluation, and treatment of MG. (Tr. 1944-1947, 1949-1955) Dr. Goldstein also provided his opinion about Plaintiff's functional limitations based on his review of the record. (Tr. 1947-48) Here, the ALJ fulfilled her duty to

---

[17] On May 18, 2022, Dr. Alam submitted a statement reiterating that Plaintiff's MG diagnosis was based on a positive antibody test and that the diagnosis was supported by Plaintiff's symptoms and her response to medication. (Tr. 3075) Dr. Alam stated Plaintiff's fatigue was reasonably consistent with her diagnosis and treatment. (Tr. 3075)

develop the record by obtaining additional medical evidence regarding Plaintiff's physical limitations and she was not required to seek additional information from Plaintiff's treating physician.  This evidence combined with the other evidence in the record, including the extensive medical records, were sufficient for the ALJ to determine Plaintiff's functional capacity and whether she is disabled. Given the evidence of record, this is not a case in which a crucial issue was undeveloped and it was not necessary for the ALJ to obtain additional medical opinions regarding Plaintiff's conditions.

### d.  Dr. Cottone's Opinion

With respect to her mental impairments, Plaintiff contends the ALJ erred in affording Dr. Cottone's medical opinion "significant weight" because Dr. Cottone was a non-examining doctor who reviewed a "minimal" portion of the record.[18]  [ECF No. 19]  Plaintiff further contends that the ALJ's citations to the record in support of her assessment of Dr. Cottone's opinion are insufficient because they contained citations to duplicate or irrelevant medical records, including records unrelated to her mental health conditions and to treatment outside of the relevant time period.  [ECF No. 19] Plaintiff also argues that the ALJ "made [her] own determination as to how Plaintiff's various mental health symptoms affect her functioning" in finding that Dr. Cottone's assessment that Plaintiff had mild limitations in two of broad functional areas was not supported

---

[18] The Court is unable to clearly discern Plaintiff's position on appeal. Specifically, it is unclear if Plaintiff believes an error occurred with respect to: (1) the ALJ's acceptance of Dr. Cottone's assessment of Plaintiff's mental health conditions and his finding that those impairments were non-severe, (2) the ALJ's acceptance of Dr. Cotton's assessment that Plaintiff's non-severe impairments result in some mild limitations in two areas of mental functioning, (3) the ALJ's rejection of Dr. Cotton's assessment that Plaintiff's non-severe impairments result in mild limitations of two different areas of mental functioning, or (4) some combination of the above.

For example, Plaintiff argues both that Dr. Cottone's opinion should not be afforded significant weight but also that the ALJ did not properly support her rejection of portions of Dr. Cottone's opinion. [ECF No. 19] Because Plaintiff does not provide a cohesive argument for either acceptance or rejection of Dr. Cottone's opinion, or parts thereof, the Court examines Plaintiff's claims as an assertion that the ALJ did not comply with the regulatory requirements for the evaluation of a medical opinion.

by the record. [ECF No. 19]   The Commissioner responds that the ALJ's evaluation of Dr. Cottone's opinion was supported by treatment notes from the relevant time period and Dr. Park's medical source statement. [ECF No. 25]

On October 21, 2016, Dr. Robert Cottone, Ph.D, a state-agency non-examining consultant, opined that Plaintiff had the non-severe impairments of affective disorder, anxiety disorder, "organic mental disorder" or autism, and oppositional/defiant disorder. (Tr.  53) Dr. Cottone concluded Plaintiff's medically determinable mental impairments resulted in mild restrictions to her activities of daily living; mild difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence or pace; and no repeated episodes of decompensation. (Tr.  54). In support, Dr. Cottone cited to treatment notes from medical appointments with Plaintiff's mental health provider from July and October 2016, and Plaintiff's subjective complaints and reports. (Tr.  746, 806)

Treatment notes from the July 2016 appointment demonstrate that Plaintiff was diagnosed with generalized anxiety disorder, and mild recurrent major depression. (Tr.  746) Plaintiff reported to her provider, Melinda Radar, NP, that her "main stressor is school" and that she is doing well. (Tr.  746) Plaintiff's medications were "working well for her" and she did not experience any side effects. (Tr. 746) Nurse Radar noted that Plaintiff was appropriately groomed, and alert and oriented. (Tr.  746) Plaintiff exhibited clear speech, good eye contact, logical thought processes, fair insight and judgment, good mood, and a bright affect. (Tr.  746)

Dr. Cottone also considered Plaintiff's October 2016 mental health appointment with Robin Park, M.D. (Tr.  806-808) Dr. Park diagnosed Plaintiff with Aspergers, obsessive-compulsive disorder, and somatization disorder. (Tr.  806) Plaintiff's chief complaint was a desire "to work on [her] anxiety." (Tr.  807) Plaintiff was alert, able to appropriately attend to

35

conversation, well-groomed, and exhibited normal cognition and memory. (Tr.  808) Dr. Park documented that Plaintiff's affect was appropriate but her mood was anxious. (Tr.  808)

The ALJ found that Dr. Cottone's opinion was entitled to "significant weight" but that his finding that Plaintiff had mild limitations in the ability to concentrate, persist, or maintain pace and to adapt or manage herself were not supported because the evidence showed Plaintiff frequently had no confusion, inattention, or memory loss; was able to attend to conversation; and was well-groomed. (Tr.  1918) In support, the ALJ cited to Plaintiff's medical records from several medical and mental health treatment providers. (Tr.  1918)

Plaintiff contends that the ALJ's citations to the record in support of her assessment of Dr. Cottone's opinion are insufficient because they contained citations to duplicate or irrelevant medical records, including records unrelated to her mental health conditions and to treatment outside of the relevant time period.   [ECF No. 19] While some of the ALJ's citations to the record offered in support of her evaluation of Dr. Cottone's opinion were duplicate copies of the same records or were to records outside of the relevant time period, the ALJ cited to numerous medical records that support her conclusion, including the records of Dr. Park, Dr. Al-Dahhak, and  Carrie Daigle, M.D.

The ALJ cited to treatment records from Dr. Park, Plaintiff's mental health provider, whose notes reflect that Plaintiff was alert, able to "appropriately attend to conversation," well-groomed, and that her cognition and memory were intact during numerous examinations between August 2016 and April 2018.  (Tr.  1849, 1851, 1853, 1855, 1857, 1859, 1861, 1862, 1864, 1866). The ALJ also cited to the treatment notes of neurologist Dr. Al-Dahhak, in which Dr. Al-Dahhak repeatedly documented that Plaintiff was alert, responsive, and attentive with good grooming during visits between May 2018 and September 2019. (Tr.  2748, 2785-2786, 2811-12, 2815,

2836). The ALJ also considered a May 25, 2021, "Patient Health Questionnaire for Depression" completed by Plaintiff and conducted as part of an examination by Dr. Daigle for a medication refill for Plaintiff's Wellbutrin.[19] (Tr.  2595-96) Although Plaintiff reported having "trouble concentrating" several days over the prior two weeks,  Dr. Daigle observed that Plaintiff's depression and anxiety appeared to be "stable" while on Wellburtin. (Tr.  2589, 2596) Because the ALJ considered numerous factors in determining the weight to give Dr. Cottone's opinion, including the supportability of his opinion and the consistency of his opinion with the other medical evidence in the record, the Court finds the ALJ did not in affording Dr. Cottone's opinion significant weight.

Plaintiff also contends that Dr. Cottone's opinion could not be considered substantial evidence because he was a non-examining witness whose opinion lacked evaluation of a significant portion of the medical records that document years of treatment. [ECF No. 19] This contention is also without merit.

There are two relevant time periods in this case: (1) between October 2016 and October 2020 for Plaintiff's DCA benefits[20] and (2) from May 30, 2017 through October 14, 2022 for Plaintiff's SSI benefits.[21]  Dr. Cottone's October 2016 opinion fits within that relevant time period for Plaintiff's application for DCA benefits. The fact that Plaintiff underwent additional treatment following Dr. Cottone's opinion does not invalidate his opinion or render it unreliable. The ALJ was aware of Plaintiff's treatment following Dr. Cottone's opinion and the medical records and

---

[19] In her brief in support of the complaint, Plaintiff maintains that this record, found on page 167 of exhibit 23F, provides "no support for the allegations made in the decision" because this is a "random page of a May 25, 2021 visit." As discussed above, Plaintiff's argument is not an accurate representation of the record.

[20] This is the period after Plaintiff attained the age of 18 and until she attained the age of 22.

[21] The second period is the date of Plaintiff's application for SSI benefits through the date of the ALJ's decision.

evidence related to those events was considered by the ALJ in determining the weight to give Dr. Cottone's assessment. (Tr.  1918) Notably, the ALJ concluded that Plaintiff has fewer limitations than opined by Dr. Cottone, finding that Plaintiff had no limitations in two of the four functional areas based on medical treatment Plaintiff received after Dr. Cottone's opinion. (Tr.  1918)

Furthermore, even though Dr. Cottone was a non-examining witness, the ALJ was tasked with determining the appropriate amount of weight to give his opinion. See 20 C.F.R. § 404.1527(c); 416.927(c). Here, the ALJ considered that Dr. Cottone only reviewed the evidence available when he issued his opinion in October 2016 and found that some of Dr. Cottone's opinion was entitled to significant weight but that some of the limitations he found were not supported by the other evidence in the record. (Tr.  1918) Because Dr. Cottone's opinion was sufficiently supported by the evidence he considered and the ALJ considered the appropriate factors in assessing the weight of Dr. Cottone's opinion, the Court finds the ALJ did not err in evaluating Dr. Cottone's opinion in determining Plaintiff's mental RFC.

Plaintiff also maintains that the ALJ "made [her] own determination as to how Plaintiff's various mental health symptoms affect her functioning" in finding that Dr. Cottone's assessment that Plaintiff had mild limitations in two of the broad functional areas was not supported by the record.  [ECF No. 19]  As already noted, in assessing Plaintiff's limitations from her mental health conditions, the ALJ considered not only Dr. Cottone's medical opinion but also the medical records; the June 2018 medical source statement completed by Dr. Park; and Plaintiff's testimony and self-reported activities of daily living. (Tr.  1917-1919)

Plaintiff self-reported that she had the ability to pay attention for 20 minutes at a time, drive up to 35 miles, use the computer for 20 to 30 minutes at a time; attend college; and perform daily chores. (Tr.  1917-1918). Dr. Park, Plaintiff's treating physician for her mental health conditions,

opined that Plaintiff had moderate limitations in her ability to concentrate, persistence, and pace, and had no limitations in her ability to understand, remember or apply information or adapt or manage herself.  (Tr.  1837-1842) Further, Dr. Park stated that Plaintiff's limitations were not based upon her "psychological illnesses- which are treated[.]"(Tr.  1840-41).

The ALJ gave "great weight" to Dr. Park's opinion that Plaintiff had no limitations in her ability to understand, remember or apply information or to adapt or manage herself because Dr. Park's assessment was supported by and consistent with Plaintiff's testimony that her medication successfully managed her anxiety symptoms and the treatment records of Dr. Park and other providers reflecting that Plaintiff had no confusion or inattention, normal memory, and was well-groomed. (Tr.  1919) In this case, the ALJ completed the psychiatric review prescribed by the regulations and, after considering the record as a whole, assessed the severity of Plaintiff's mental impairments.

C.  Severe Impairments

Plaintiff contends that the ALJ erred in finding that Plaintiff's migraines and "various mental health impairments," including conversion disorder/somatic syndrome, obsessive compulsive disorder, anxiety, depression and autism, were not severe impairments. [ECF No. 19] Plaintiff contends these impairments significantly limited "her mental abilities to do basic work activities" as she reported decreased energy, lack of motivation, depression, anxiety, and crying spells. [ECF No. 19] The Commissioner counters that any alleged error by the ALJ in finding that Plaintiff's headaches and "various mental health impairments" were non-severe was harmless because the ALJ determined that Plaintiff had severe impairments at step two of the sequential analysis and considered all of Plaintiff's severe and non-severe impairments when determining Plaintiff's RFC.  [ECF No. 25]

At step two of the evaluation process, the ALJ must determine if a claimant suffers from a severe impairment. Kirby v. Astrue, 500 F.3d 705, 707 (8th Cir. 2007). See also 20 C.F.R. § 416.920(a)(4)(ii).  A severe impairment is a medically determinable impairment that "significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 416.922(a). Although the plaintiff has "the burden of showing a severe impairment that significantly limited [her] physical or mental ability to perform basic work activities[,] . . . the burden of a claimant at this stage of the analysis is not great." Caviness v. Massanari, 250 F.3d 603, 605 (8th Cir. 2001). See also Kirby, 500 F.3d at 708 ("Severity is not an onerous requirement for the claimant to meet, but it is also not a toothless standard[.]") (internal citation omitted).

A court may find that an error at step two, in failing to find a particular impairment severe, does not require reversal where the ALJ finds other severe impairments and considers all of the claimant's impairments, severe and non-severe, in the subsequent analysis. Cuthrell v. Astrue, 702 F.3d 1114, 1118 (8th Cir. 2013). Here, the ALJ found Plaintiff had the severe impairments of MG, extreme obesity, and asthma, and considered all of the Plaintiff's medically determinable impairments in formulating Plaintiff's RFC. (Tr.  1920-1927)  Thus, even if the ALJ erred in concluding that Plaintiff's headaches and mental impairments were not severe impairments at step two, such error was harmless because the ALJ considered all of Plaintiff's impairments, severe and non-severe, when formulating the RFC.

   D.  RFC determination

Plaintiff argues the ALJ's RFC is not supported by substantial evidence and "lacks rationale describing how the evidence supports the findings" because: (1) the RFC "mirrors" Dr. Goldstein's opinion which "appears to be based upon a lack of testing he requires versus

40

evidence of an ability to function at the sedentary level on reliable and consistent basis[,]" (2) it fails to address medical records demonstrating Plaintiff was "diagnosed with migraine headaches, dizziness, somatic disorder, and hypersomnolence[,]" (3) the ALJ failed to evaluate Plaintiff's fatigue, and (4) the ALJ improperly "disregarded" "weakness documented by Dr. Alam[.]" [EFF No. 19] The Commission counters that the ALJ acted within her discretion to resolve conflicts in the record, gave good reasons for the functional limitations that she found, and that the record does not warrant the assignment of any greater limitations. [ECF No. 25]

RFC is the most a claimant can perform in a work setting despite that claimant's physical or mental limitations. Martise v. Astrue, 641 F.3d 909, 923 (8th Cir. 2011) (citation omitted); 20 C.F.R. §416.945(a)(1). The ALJ determines a claimant's RFC "based on all relevant evidence, including medical records, observations of treating physicians and others, and claimant's own descriptions of [his or her] limitations." Kraus v. Saul, 988 F.3d 1019, 1024 (8th Cir. 2021) (quoting Papesh v. Colvin, 786 F.3d 1126, 1131 (8th Cir. 2015)); 20 C.F.R. § 416.945(a)(1).

Although the ALJ bears the primary responsibility for assessing a claimant's RFC based on all relevant evidence, "a claimant's residual functional capacity is a medical question." Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001) (quoting Singh v. Apfel, 222 F.3d 448, 451 (8th Cir. 2000)). "Because a claimant's RFC is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace." Hensley v. Colvin, 829 F.3d 926, 932 (8th Cir. 2016) (quoting Cox v. Astrue, 495 F.3d 614, 619 (8th Cir. 2007)). "An administrative law judge may not draw upon his own inferences from medical reports." Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000). It is the Plaintiff's burden to prove her RFC. Kraus, 988 F.3d at 1024.

As already discussed, the ALJ did not err in evaluating the Dr. Goldstein's and Dr. Alam's medical opinions. The ALJ properly afforded Dr. Goldstein's medical opinion significant weight and was entitled to rely upon Dr. Goldstein's assessment in determining Plaintiff's RFC. Similarly, the ALJ thoroughly considered the muscle weakness documented by Dr. Alam and did not err in finding that Dr. Alam's opinion was less persuasive due to his failure to further evaluate or quantify this weakness.  [EFF No. 19]

Plaintiff's remaining contentions, that the ALJ failed to address, evaluate, or weigh evidence of various symptoms is contradicted by the record. With respect to Plaintiff's dizziness, somatic disorder,[22] hypersomnolence, and fatigue, the ALJ considered Plaintiff's complaints, associated diagnoses, and treatment related to these symptoms at length in the determination.[23] (Tr. 1920-1926) While some of Plaintiff's testimony and self-reported activities of daily living was that she was completely debilitated by these symptoms, the ALJ found that Plaintiff's statements concerning the intensity, persistence, and limiting effects of her reported symptoms were not entirely consistent with the medical evidence and other evidence in the record. (Tr. 1920-22)

This finding by the ALJ is supported by substantial evidence in the record. Plaintiff repeatedly asserted that *any* activity, even as little as 10 minutes of chores or a 30-minute errand, required extended periods of recuperation ranging from an hour of rest to 12 hours of sleep.  In the function report, Plaintiff contended that she did not do any chores during the school year and

---

[22] Plaintiff alleges in her brief that her somatic disorder/conversion disorder manifests as "debilitating lightheadedness." [ECF No. 19, p. 13] The ALJ discussed Plaintiff's lightheadedness multiple times in her assessment of Plaintiff's RFC. (Tr.  1920-24)

[23] Plaintiff also argues that the ALJ's RFC does not account for the medical records demonstrating Plaintiff suffers from migraine headaches. [ECF No. 19] However, Plaintiff admits that her headaches "largely disappeared" by May 27, 2015, which predates the relevant time periods, the earliest of which began in October 2016.

that she needed "help and encouragement" to perform 5 to 10 minutes of chores a day when school was not in session. (Tr.  187-188) Plaintiff further asserted that even when she does not do any chores "just being around the house all day, getting up and moving around" causes her "problems." (Tr. 2001) Plaintiff testified that performing a job that required sitting "all day" would cause her fatigue because sitting causes her to experience light-headedness. (Tr.  2000)

Plaintiff's alleged inability to function at any level is inconsistent with the evidence that she mostly maintained her college education full-time. Plaintiff testified that she completed seven semesters of college over a four-year period. (Tr.  1966)  Plaintiff reported to two of her medical providers that she elected to continue her education by attending a full-time graduate program. (Tr.  2343, 2286) Plaintiff's ability to continue her college education despite her symptoms supports a finding that Plaintiff can perform at least as the sedentary level.

The medical records and opinions from Plaintiff's treating physicians further supported the ALJ's finding. Dr. Park found Plaintiff had no limitations due to her mental health impairments and only moderate limitations in one broad functional area due to her MG. (Tr. 1840-41) Although Dr. Alam's treatment records reflect Plaintiff suffered from fatigue, Dr. Alam provided no evaluation of her fatigue. Although Dr. Alam provided two medical source statements, neither provided for significant limitations to Plaintiff's functioning. (Tr.  1813-1818, 2411-2417) At most, Dr. Alam found Plaintiff needed to shift positions at will and a single 10-to-15 minute unscheduled break each day. (Tr.  1813-1818)  Both of Dr. Alam's opinions stated that Plaintiff would miss two days per month due her illness and treatment. (Tr. 1818, 2417) Dr. Alam's medical source statements are inconsistent with Plaintiff's self-reported inability to perform any sustained activity.  Despite the ALJ's conclusions regarding Plaintiff's self-reported abilities, ALJ found that Plaintiff's MG "resulted in limitations related to weakness, fatigue, and

43

lightheadedness" that "supported limitations to Plaintiff's exertional, postural, and environment abilities[.]" The ALJ accounted for these limitations in the RFC providing for sedentary work with additional exertional and non-exertional limitations. (Tr. 1923) Here, the ALJ properly considered Plaintiff's medical records, the medical opinion evidence, and Plaintiff's testimony and self-reported activities of daily living in assessing Plaintiff's RFC. Accordingly, the Court finds the ALJ's RFC is supported by substantial evidence in the record.

## VI.  Conclusion

For the reasons discussed above, the Court finds that substantial evidence in the record as a whole supports the Commissioner's decision that Plaintiff is not disabled. Accordingly,

**IT IS HEREBY ORDERED** that the final decision of the Commissioner denying Social Security benefits to Plaintiff is **AFFIRMED**.

A separate judgment in accordance with this Memorandum and Order is entered this date.

PATRICIA L. COHEN
UNITED STATES MAGISTRATE JUDGE

Dated this 9th day of February, 2024

44